Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Wilfredo Silva Olivencia, Yvette Alicea Ruiz y la Sociedad Legal de Gananciales compuesta por ambos<br><br>        Peticionarios<br><br>                v.<br><br>Boquerón Resort S.E., h/n/c Aquarius Vacation Club<br><br>        Recurrido<br><br>Departamento de Asuntos del Consumidor<br><br>        Agencia Recurrida | Certiorari<br><br>2012 TSPR 131<br><br>186 DPR ____ |

Número del Caso: CC-2009-660

Fecha: 22 de agosto de 2012

Tribunal de Apelaciones:

        Región Judicial de San Juan, Panel I

Abogados de la Parte Peticionaria:

        Lcdo. Heriberto Güivas Lorenzo
        Lcda. Luisselle Quiñones Maldonado

Abogados de la Parte Recurrida:

        Lcda. Alina M. Ortega-César

Materia: Revisión Administrativa procedente del Departamento de Asuntos al Consumidor

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilfredo Silva Olivencia, Yvette
Alicea Ruiz y la Sociedad Legal de
Gananciales compuesta por ambos
    Peticionarios

            v.

                              CC-2009-660    Certiorari

Boquerón Resort S.E., h/n/c
Aquarius Vacation Club
    Recurrido

Departamento de Asuntos del
Consumidor
    Agencia Recurrida


Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ


San Juan, Puerto Rico, a 22 de agosto de 2012.

Nos corresponde examinar por primera ocasión la Ley de Derecho de Multipropiedad y Clubes Vacacionales de Puerto Rico, Ley Núm. 252-1996, 31 L.P.R.A. secs. 1251, *et seq.* (Ley Núm. 252), según enmendada. Específicamente, debemos resolver si un consumidor de esta industria puede cancelar un contrato de compraventa de una multipropiedad o club vacacional cuando sus instalaciones no se completan dentro de la fecha estimada en el documento de ofrecimiento al público (*public offering statement*) y no se provee una advertencia del derecho del desarrollador a finalizarlas dentro de un término

de dieciocho meses, reconocido expresamente en la ley especial.

I

El 3 de abril de 2005, el Sr. Wilfredo Silva Olivencia y su esposa la Sra. Yvette Alicea Ruiz (Silva-Alicea) adquirieron de Aquarius Vacation Club (Aquarius) una semana de uso anual, correspondiente a la segunda del mes de junio, por el término de sesenta años en el complejo vacacional Boquerón Beach Resort. Para ello, pagaron $10,000, $55 de gastos administrativos y $170 por la cuota de mantenimiento del 2006. El contrato suscrito por las partes estableció que el derecho de uso comenzaría en el 2006. Conjuntamente, en el documento de ofrecimiento público se informó a los esposos Silva-Alicea que la construcción de las instalaciones estaría completada para la primera mitad de ese año.

Posteriormente, los esposos Silva-Alicea hicieron las gestiones para el disfrute de la semana adquirida. Al hacerlo se les informó que no podían disfrutarla, ya que las instalaciones no estaban construidas. Como consecuencia, en agosto de 2006 presentaron una querella ante el Departamento de Asuntos del Consumidor (D.A.Co.). Alegaron que Aquarius incumplió el contrato debido a que en el 2006 no pudieron disfrutar su derecho vacacional, puesto que las instalaciones todavía se encontraban en construcción. Ello a pesar de que el contrato establecía que su derecho comenzaría ese año. A base de esas alegaciones, solicitaron la cancelación del contrato y la

devolución de lo pagado. Los esposos no solicitaron ni presentaron prueba de daños, ya que sometieron su caso mediante memorando de derecho.

Instado el procedimiento ante D.A.Co., Aquarius arguyó que no incumplió con el contrato. Indicó que la Ley Núm. 252, *supra*, le permite completar las instalaciones dentro de un periodo de dieciocho meses siguientes a la fecha estimada por el desarrollador. Sostuvo que actuó conforme al estatuto debido a que solicitó a tiempo un término adicional para finalizar el desarrollo y que éste le fue conferido.

Al no haber controversias sobre los hechos, las partes sometieron la polémica a través de memorandos de derecho. Luego de evaluar los mismos, D.A.Co. emitió una determinación el 27 de agosto de 2008 en la cual decretó la resolución del contrato y la devolución de los $10,225 pagados por Silva-Alicea. La agencia interpretó que Aquarius incumplió con su obligación. Articuló que Aquarius acordó con el matrimonio Silva-Alicea la disponibilidad de las instalaciones para la segunda semana de junio de 2006, lo que no ocurrió. Entendió que las manifestaciones de Aquarius podrían considerarse como una práctica engañosa.

A tiempo, Aquarius presentó una solicitud de reconsideración. En ésta impugnó la resolución del contrato y del reembolso ordenado. D.A.Co. nada dispuso en cuanto a la reconsideración presentada, por lo que Aquarius acudió oportunamente ante el Tribunal de

Apelaciones mediante un recurso de revisión administrativa.

En síntesis, Aquarius argumentó que la Ley Núm. 252, *supra*, salvaguarda la industria del turismo y la calidad de los planes de derecho de multipropiedad y clubes vacacionales en Puerto Rico. Indicó que el estatuto provee hasta un máximo de dieciocho meses adicionales a la fecha informada por el desarrollador para terminar los alojamientos y las instalaciones.[1] Asimismo, expuso que el derecho de cancelación del contrato había expirado, no existía ninguna razón para su resolución y no incurrió en una práctica engañosa porque cumplió con todos los requisitos de la Ley Núm. 252, *supra*.

El 29 de abril de 2009 el Tribunal de Apelaciones emitió una sentencia en la cual revocó al D.A.Co. El foro intermedio concluyó que según dispone la Ley Núm. 252, *supra*, Aquarius contaba con un término adicional de dieciocho meses al informado en el ofrecimiento público para tener las instalaciones terminadas. El foro apelativo intermedio determinó que Aquarius cumplió con los requisitos para ser acreedor de ese periodo adicional según evidencia la certificación emitida por la Compañía de Turismo. Determinó que el hecho de que Aquarius no "informara en detalle lo que establece la Ley aplicable al

---

[1] Del expediente surge que Aquarius informó a la Compañía de Turismo sobre el hecho de que no culminaría las instalaciones dentro del período estimado. Véase, Certificación emitida por la Compañía de Turismo el 20 de noviembre de 2007, Apéndice, pág. 168.

negocio jurídico en el que la parte recurrida [Silva-Alicea] se estaba involucrando no implica que indujo al comprador a error y viciara su consentimiento". Además, decretó que los esposos Silva-Alicea debieron informarse adecuadamente, ya que el desconocimiento de la ley no exime de su cumplimiento.

Inconformes, los esposos Silva-Alicea acudieron ante este foro y señalaron que el Tribunal de Apelaciones erró al no suplir las deficiencias de la Ley Núm. 252, *supra*, debido a que no aplicó el principio de buena fe a la relación contractual, a pesar de que Aquarius no divulgó que las instalaciones no estarían construidas para el disfrute de éstos en el 2006. Asimismo, cuestionó que el foro intermedio les impusiera una obligación adicional a los adquirientes de este tipo de propiedad, en contravención al propósito de la Ley Núm. 252, *supra*.

En reconsideración, el 19 de marzo de 2010 este Tribunal expidió el recurso. Con el beneficio de la comparecencia de las partes, procedemos a adjudicar la controversia planteada.

II

A.

Los orígenes de los planes de derecho de multipropiedad y clubes vacacionales responden a la necesidad de buscar alternativas a las tradicionales para vacacionar. En los Estados Unidos, sus inicios se remontan a la década del setenta como resultado de la necesidad de atender los cambios económicos que enfrentaba la sociedad.

La proliferación de este tipo de negocio incrementó a tal grado que creó la necesidad de implantar legislación para regular la industria y las técnicas de ventas utilizadas para su promoción.[2] Véanse, D.A. Bowen, Timeshare Ownership: Regulation and Common Sense, 18 Loy. Consummer L. Rev. 459 (2006); A.S. Burek, Uniform Real Estate Time-Share Act, 14 Real Prop. Prob. & Tr. J. 683 (1979).

Al igual que otras jurisdicciones, y constituyendo la industria turística un elemento importante en el desarrollo económico de Puerto Rico, la Asamblea Legislativa presentó interés en promulgar legislación con relación a la industria de multipropiedad y clubes vacacionales, con el propósito dual de promoverla y proteger a sus compradores. Con ese fin, la Ley Núm. 252, *supra*, uniformó y reglamentó este sector económico y los derechos de los consumidores locales y extranjeros. Sec. 1-102 de la Ley Núm. 252, 31 L.P.R.A. sec. 1251. La promulgación del estatuto responde a la intención de uniformar y gobernar en forma exclusiva, con una sola ley, este tipo de industria. Véase, Ponencia de la Compañía de Turismo de 24 de agosto de 1995 relacionada al P. de la C. 2088, pág. 2. De esta forma se notifica tanto al consumidor local y extranjero en un solo cuerpo legal los derechos y  obligaciones de cada una de las partes.

---

[2] Para el 2004 en Estados Unidos se estimó en cerca de $7.9 billones la industria de multipropiedad y clubes vacacionales. D.A. Bowen, Timeshare Ownership: Regulation and Common Sense, 18 Loy. Consummer L. Rev. 459, 463 (2006).

La elaboración de la Ley Núm. 252, *supra*, constituyó un ejercicio que contó con el beneficio del conocimiento de los desarrolladores de proyectos en Puerto Rico y de otras jurisdicciones. Igualmente, durante el proceso legislativo de aprobación, participaron agencias representativas del interés público, tales como el Departamento de Justicia, el D.A.Co. y la Compañía de Turismo.[3] Además, se recurrió como base a las leyes modelos de la American Resort Development Association (ARDA)[4] y la National Association of Real Estate Licensed Law Officials (NARELLO).[5] Éstas sirvieron, a su vez, como modelo para promulgar estatutos similares en varias jurisdicciones dirigidos a reglamentar esta industria. Asimismo, los legisladores estudiaron las particularidades de nuestro sistema de derecho civil y la legislación que atiende la propiedad horizontal en nuestra jurisdicción para incluir disposiciones que no se encuentran presentes en los modelos seguidos y que responden a nuestras

---

[3] Véanse: Ponencia del Departamento de Justicia de 29 de agosto de 1995 relacionada al P. de la C. 2088; Ponencia del Departamento de Asuntos del Consumidor de 24 de agosto de 1995 relacionada al P. de la C. 2088 y la Ponencia de la Compañía de Turismo de 24 de agosto de 1995 relacionada al P. de la C. 2088.

[4] La American Resort Development Association fue fundada en el 1969 para representar la industria vacacional en los Estados Unidos. Hoy día es una asociación reconocida internacionalmente como la organización más destacada para promover el desarrollo de este tipo de industria.

[5] La National Association of Real Estate Licensed Law Officials es una fundación oficial que sirve para licenciar agentes de bienes raíces para cumplir con las leyes de este campo.

particularidades legales. Véase, Ponencia de la Compañía de Turismo de 24 de agosto de 1995 relacionada al P. de la C. 2088, *supra*.

En términos generales la Ley Núm. 252, *supra*, dispone que el régimen de multipropiedad o club vacacional se establezca mediante escritura pública inscrita en el Registro de la Propiedad. El mencionado régimen puede estructurarse como un derecho contractual para usar y ocupar el alojamiento objeto de éste, o una clase especial de derecho de propiedad con derecho de usar y ocupar un alojamiento en particular. Sec. 1-103 de la Ley Núm. 252, 31 L.P.R.A. 1251a. A su vez, el estatuto requiere un permiso expedido por la Compañía de Turismo para que un desarrollador o vendedor pueda ofrecer o disponer del derecho de multipropiedad, del derecho vacacional o alojamiento a un comprador potencial en Puerto Rico o sobre este tipo de propiedad localizada en Puerto Rico. Sec. 2-101 de la Ley Núm. 252, 31 L.P.R.A. sec. 1252. La Ley Núm. 252, *supra*, atiende lo relacionado al método de administración del plan de derecho de multipropiedad o club vacacional, la forma en que se establecen, cobran y pagan las cuotas de los gastos comunes, el método de operación del sistema de reservaciones, el procedimiento a seguir para el relevo de las funciones a la entidad administradora, las prácticas proscritas, los programas de intercambio y los poderes de la Compañía de Turismo.

En lo relevante a la situación ante nuestra consideración, la Ley Núm. 252, *supra*, confiere unas

salvaguardas a los consumidores de este tipo de industria. Las mismas están dirigidas a cumplir con uno de los propósitos de la ley especial de proteger a los consumidores. Entre éstas, el desarrollador debe evidenciar a la Compañía de Turismo que el alojamiento particular objeto del derecho de multipropiedad o derecho vacacional es uno protegido, es decir, que está libre de reclamaciones por parte de cualquier tenedor de gravámenes excepto en las situaciones dispuestas por el propio estatuto. Sec.4-101 de la Ley Núm. 252, 31 L.P.R.A. sec. 1254. Igualmente, la legislación impone al desarrollador la obligación de depositar en una cuenta en plica (*escrow account*) todos los depósitos recibidos por los compradores de derecho de multipropiedad, derechos vacacionales o alojamiento hasta que transcurra el periodo de rescisión establecido en la ley. Sec. 3-102 de la Ley Núm. 252, 31 L.P.R.A. sec. 1253a.

Lo anterior nos remite al derecho de cancelación que tienen los compradores al amparo de la Ley Núm. 252, *supra*. Con el propósito dual de impulsar este tipo de mercado, y proteger al consumidor local y extranjero, nuestro estatuto incorporó la experiencia de otras jurisdicciones. Como consecuencia, el legislador adoptó un término de siete días en el cual el comprador tiene la potestad absoluta de rescindir el acuerdo de compraventa de un derecho de multipropiedad o club vacacional. Este periodo permite al comprador impulsivo recapacitar (*cooling-off*) sobre una decisión para adquirir este tipo

de derecho propietario en respuesta a las prácticas persistentes de ventas que se utilizan para atraerlos. Además, le permite evaluar el compromiso contractual contraído y optar por desistir de la obligación si determina que ésta no satisface todas sus expectativas o resultaría en una carga onerosa a su capacidad económica. Véanse: Ponencia del Departamento de Asuntos del Consumidor de 24 de agosto de 1995 relacionada al P. de la C. 2088, pág. 1; E.A. Cameron & S. Maxwell, Protecting consumers: The contractual and real estate issues involving timeshares, quartershares, and fractional ownerships, 37 Real Est. L.J. 278, 297 (2009).

El periodo de rescisión absoluto es de tal importancia que la reglamentación exige que el mismo sea informado de forma conspicua antes del lugar designado para la firma del comprador.[6] El derecho de rescisión dentro del término de siete días provisto por la Ley Núm. 252, *supra*, no

---

[6]La Ley Núm.252, *supra*, define el término conspicuo de la siguiente forma:

    (a)   Tipo en letras mayúsculas y minúsculas que no sea de tamaño menor [de] dos (2) puntos [de] tipo más grandes que el tipo de tamaño más grande, sin contar los encabezamientos, en la página donde aparece, pero en todos los casos que no sea menor de diez (10) puntos o

    (b)   donde el uso de un tipo de tamaño de diez (10) puntos sería impráctico o imposible con respecto a un material escrito en particular entonces el estilo de tipo o de impreso que la Compañía apruebe específicamente, siempre y cuando el tipo siga siendo conspicuo bajo las circunstancias. Inciso 13 de la Sec. 1-104 de la Ley Núm. 252, 31 L.P.R.A. 1251b(13).

puede ser renunciado por el comprador. La Ley Núm. 252, *supra*, dispone expresamente que cualquier documento o acción que pueda implicar una renuncia a este derecho se considera nula y sin efecto. Secs. 3-101 y 4-103 de la Ley Núm. 252, 31 L.P.R.A. secs. 1253, 1254b; Véanse, además, Bowen, *supra*, págs. 474-475; E.R. Pierce & R.A. Mann, Time-Share Interests in Real Estate: A Critical Evaluation of the Regulatory Environment, 59 Notre Dame L. Rev. 9, 51 (1983-1984).

Además del término de rescisión de siete días de la Sec. 3-101 de la Ley Núm. 252, *supra*, nuestra jurisdicción reconoce mayor protección a los consumidores al promulgar un derecho a cancelar el contrato de compraventa si el desarrollador no culmina los alojamientos que son objeto del contrato de compraventa o el derecho de multipropiedad o vacacional dentro del término de dieciocho meses siguientes a la fecha estimada por el desarrollador para la terminación del alojamiento o las instalaciones. En caso de ejercer el derecho de extensión de la fecha estimada, el desarrollador deberá solicitar la aprobación por escrito a la Compañía de Turismo exponiendo los costos relacionados en la terminación del alojamiento, el tiempo estimado que necesita para ello con copia del contrato de construcción otorgado para la terminación de la construcción, evidencia satisfactoria de los fondos para completarla, una fianza y una carta de crédito que acredite la disponibilidad de activos netos para asegurar

el cumplimiento. Véase, además, Sec. 4-103 de la Ley Núm.

252, 31 L.P.R.A. sec. 1254b.[7]

---

[7]La Sec. 4-103 de la Ley Núm. 252, 31 L.P.R.A. sec. 1254b dispone como sigue:

(1) Un desarrollador deberá completar todos los alojamientos y instalaciones, la futura disponibilidad de los cuales se le representa por él o [en] su nombre a los compradores, bien sea en los documentos del plan de derechos de multipropiedad o club vacacional, en material de promoción o de publicidad, en declaraciones orales o escritas o por cualquier otro medio dentro de los dieciocho (18) meses siguientes a la fecha designada por el desarrollador de acuerdo con lo provisto en el inciso (2)(b) de esta sección.

(2) Un desarrollador deberá radicar con la Compañía la siguiente información en relación con cualquier alojamiento o facilidad que no esté terminado para la fecha en que se haga cualquier representación sobre el mismo:

(a) Una declaración escrita divulgando todos los costos envueltos en la terminación del alojamiento o facilidad de que se trate.

(b) Una declaración escrita en que se indique el tiempo estimado que se necesita para la terminación del alojamiento o facilidad de que se trate.

(c) Una copia del contrato de construcción otorgado y cualesquiera otros contratos otorgados para la terminación del alojamiento o facilidad.

(d) Evidencia satisfactoria de la disponibilidad de fondos suficientes para completar dicho alojamiento o facilidad que consistirá de:

(i) Una fianza de pago y cumplimiento por una cantidad igual al cien por ciento (100%) del costo anticipado para la terminación del alojamiento o facilidad de que se trate. Cualquier fianza de tal naturaleza será emitida por un fiador o compañía de seguros autorizado a hacer negocios en Puerto Rico y que tenga suficientes activos netos como para ser aceptable para la Compañía, o

(ii) una carta de crédito por la cantidad especificada en el párrafo (i) anterior emitida

Lo expuesto demuestra que no existe polémica en cuanto a que la Ley Núm. 252, *supra*, otorga un derecho de rescisión absoluto al comprador a cancelar el contrato dentro del término de siete días desde que se otorgó el contrato de compraventa. Tampoco debe cuestionarse que el estatuto otorga al desarrollador un término adicional de dieciocho meses para terminar la construcción de las instalaciones y el derecho del comprador a cancelar el contrato si los alojamientos no se completan dentro de ese periodo. La interrogante que se genera ante nuestra consideración es si el desarrollador tiene la obligación de divulgar el hecho de que la Ley Núm. 252, *supra*, le confiere ese término adicional a la fecha informada para completar las instalaciones y cómo ello afecta a la buena fe y el consentimiento prestado al otorgar el contrato de compraventa.

_____

por un banco, una asociación de ahorros y préstamos o cualquier otra institución financiera autorizada a hacer negocios en Puerto Rico asegurada por una dependencia del gobierno federal y que tenga suficientes activos netos como para ser aceptable para la Compañía. Cualquier fianza o carta de crédito de la naturaleza antes descrita será irrevocable hasta tanto el desarrollador complete el alojamiento o facilidad prometido. De ser necesario para la Compañía acudir a la fianza o carta de crédito para asegurar la terminación del alojamiento o facilidad, la Compañía tendrá autoridad para solicitar de un tribunal con jurisdicción y competencia el nombramiento de un síndico para que se encargue de dirigir y administrar dicha terminación.

B.

A estos efectos, el examen de la Ley Núm. 252, *supra*, refleja que ésta regula los requisitos de forma y contenido del documento de ofrecimiento público que debe ser aprobado por la Compañía de Turismo y provisto a los compradores antes de otorgar el contrato de compraventa. Sec. 5-101 de la Ley Núm. 252, 31 L.P.R.A. sec. 1255. Mediante este documento se divulga de forma completa y precisa todas las características materiales del plan de derecho de multipropiedad o club vacacional para que el consumidor posea una fuente fidedigna que corrobore la veracidad de los términos y condiciones que contrate o la oportunidad de evaluar otros planes y las ofertas disponibles previo a realizar una selección. Ponencia del Departamento de Asuntos del Consumidor de 24 de agosto de 1995 relacionada al P. de la C. 2088, *supra.* De igual forma, la legislación codifica las divulgaciones mínimas que se deben realizar a los compradores. Sec. 5-102 de la Ley Núm. 252, 31 L.P.R.A. sec. 1255a.[8]

---

[8] En términos generales, las divulgaciones mínimas requeridas por la Ley Núm. 252, *supra*, incluyen: (1) el nombre y dirección principal del desarrollador y del plan adquirido; (2) el número de años que el desarrollador ha estado en los negocios en general y en la industria de turismo y entretenimiento; (3) la experiencia del desarrollador en administración; (4) la entidad administradora seleccionada; (5) el término de duración de los derechos de los titulares; (6) la descripción del sistema de reservaciones y de las reglas y reglamentos adoptados; (7) la descripción de los alojamientos y instalaciones comprendidas en el plan relacionada; (8) los alojamientos incidentales; (9) la información relacionada con la administración del plan incluyendo las cuotas, derechos o cargos corrientes; (10) la naturaleza legal del derecho adquirido; (11) una declaración notoria de que el

Dentro de las divulgaciones mínimas requeridas en beneficio del comprador, el legislador contempló algunas instancias relacionadas –como la de autos– en las que se adquiere el derecho de multipropiedad o de clubes vacacionales antes de que las instalaciones estén terminadas. A estos efectos, la Ley Núm. 252, *supra*, dispone como sigue:

> Cada documento de ofrecimiento público radicado en la Compañía, conjuntamente con cualesquiera enmiendas del mismo, deberá divulgar completa y precisamente todas las características materiales del plan de derecho de multipropiedad o club vacacional. Como mínimo, deberá contener los siguientes componentes e información actual, efectiva a la fecha de emisión por la Compañía del permiso para un plan de derecho de multipropiedad o club vacacional de acuerdo con las disposiciones de las secs. 1252 a 1252j de este título:
>
> (7) Una descripción de cada lugar base y de los alojamientos y instalaciones protegidos comprendidos en el plan de derecho de multipropiedad o club vacacional del que se trate, en forma resumida, que incluya para cada lugar base lo siguiente:
>
> (e) Si la construcción de los alojamientos o instalaciones no ha sido terminada, o cualquier alojamiento o facilidad por cualquier razón no está disponible para uso u ocupación, la fecha estimada más tardía en que estará disponible. Sec. 5-102 de la Ley Núm. 252, 31 L.P.R.A. sec. 1255a(7)(e).

---

derecho adquirido no es apropiado para inversión ni para obtener ganancias y que tampoco está sujeto a las disposiciones de la Ley de Propiedad Horizontal, Ley Núm. 103-2003, 31 L.P.R.A. sec. 1291, *et seq.*; (12) la descripción de los gravámenes que afecten los alojamientos o instalaciones; (13) la descripción del tipo de financiamiento; (14) los procedimientos disponibles para ejecución y venta del derecho sobre alojamiento en caso de incumplimiento; y (15) si el desarrollador ha realizado o tiene la intención de hacer una reserva de dedicación de uso. Sec. 5-102 de la Ley Núm. 252, 31 L.P.R.A. sec. 1255a.

El desarrollador debe incluir junto con su solicitud de permiso presentada a la Compañía de Turismo para que lo autorice a ofrecer un plan de multipropiedad o club vacacional, el documento de ofrecimiento público para su aprobación. De lo transcrito surge que la Ley Núm. 252, *supra*, requiere que como parte de las divulgaciones mínimas que deben constar en el ofrecimiento público se incluya la fecha estimada en la que el desarrollador proyecta estará disponible el uso de las instalaciones. El momento en el cual se proyecta que estará disponible una facilidad es información cardinal para el comprador. Tanto es así que la Ley Núm. 252, *supra*, establece que representar indebida o engañosamente cuándo los componentes del plan estarán disponibles para los titulares constituye una práctica prohibida a la industria. Sec. 7-104 (2)(e)(i) de la Ley Núm. 252, *supra*, 31 L.P.R.A. sec. 1258(2)(e)(i). Así, el desarrollador que informa una fecha estimada que a todas luces no podrá cumplir infringe los deberes que le impone la Ley Núm. 252, *supra.*

Al revisar la Ley Núm. 252, *supra*, resalta que el legislador no requirió al desarrollador informar sobre su derecho a completar los alojamientos e instalaciones dentro de un término adicional de dieciocho meses a la fecha estimada, debidamente informada al comprador. El hecho de que la Ley Núm. 252, *supra*, le imponga al desarrollador el deber de informar la fecha estimada en la que estará disponible el proyecto no implica que éste deba

advertir sobre el derecho que le proporciona la propia ley para culminar las instalaciones en el tiempo adicional que dispone el estatuto. La razón para ello es sencilla. La aprobación y publicación de la Ley Núm. 252, *supra*, constituye notificación suficiente para que el comprador conozca de sus derechos y los del desarrollador sobre la propiedad que adquiere al amparo de ésta. La ley advierte al consumidor en forma diáfana que un desarrollador tiene un término mayor al informado para terminar las instalaciones. Claro está, como la legislación lo que dispone son unas divulgaciones mínimas, nada impide que el desarrollador informe voluntariamente sobre tal derecho a los compradores que adquieren este tipo de propiedad. Ello tampoco implica una carta en blanco que avale las actuaciones de un desarrollador que amparado en su derecho propicie un engaño.

Aunque ciertamente la ley especial no requiere al desarrollador que informe sobre el término adicional que ésta le concede para completar las instalaciones, debemos examinar -a la luz del estatuto y las circunstancias particulares del caso- si no hacerlo constituye una violación al principio de buena fe que impone la Ley Núm. 252, *supra*, en este tipo de contratación.

C.

Es imprescindible destacar que la Ley Núm. 252, *supra*, impone una obligación de buena fe a los contratos regidos por ésta. Ello significa que haya honestidad de hecho y la observación de normas de trato justo en su cumplimiento o

aplicación. Sec. 10-102 de la Ley Núm. 252, *supra*. La buena fe significa que las partes están obligadas a actuar de forma honrada y leal. Supone el guardar la fidelidad de la palabra dada y no defraudar la confianza ni abusar de ella para que la negociación refleje una voluntad que no sea producto de la malicia y del engaño. L. Diez-Picazo, La doctrina de los propios actos, Barcelona, Eds. Aries, 1963, pág. 157. Véanse: S.L.G. Ortiz-Alvarado v. Great American, res. 3 de junio de 2011, 2011 T.S.P.R. 79, 182 D.P.R.____ (2011); VDE Corporation v. F & R Contractors, 180 D.P.R. 21, 34 (2010); Colón v. Glamourous Nails, 167 D.P.R. 33, 44-47 (2006).

La buena fe permea en todo el proceso de contratación desde sus fases iniciales preparatorias, durante la negociación del contrato propiamente y en su cumplimiento. Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 526-528 (1982). La aplicación del principio de buena fe en materia de cumplimiento contractual surge cuando una parte invoca una razón bajo la cual alega que se justifica variar su prestación afectando la relación contractual con la otra parte, pero que no debe calificarse como incumplimiento. M.J. Godreau Robles, Lealtad y buena fe contractual, 58 Rev. Jur. U.P.R. 366, 383 (1989).

Cuando se viola el principio de buena fe se puede viciar el consentimiento de la otra parte contratante. Ello incluye el no revelar hechos importantes durante un proceso de negociación que muy bien pudieron conllevar a una contratación que de otra forma no hubiere tenido

lugar. En estos casos, el principio de buena fe se invoca porque la oferta o publicidad no responde a las exigencias de lealtad y honestidad. Godreau, *supra*, págs. 419-420; Véanse: García Reyes v. Cruz Auto Corp., 173 D.P.R. 870, 886 (2008); Bosques v. Echevarría, 162 D.P.R. 830, 836 (2004); Márquez v. Torres Campos, 111 D.P.R. 854, 865 (1982).[9]

Ahora bien, no toda omisión conlleva la nulidad de la contratación. Para que ello proceda resulta necesario que la falta de información sobre determinado hecho recaiga sobre elementos esenciales del contrato que hubieran evitado a la otra parte prestar su consentimiento para la contratación. En cuyo caso las partes deberán restituirse recíprocamente las cosas otorgadas al momento del contrato. Véanse, S.L.G. Ortiz-Alvarado v. Great American, *supra*; García Reyes v. Cruz Auto Corp., *supra*, págs. 886-887.

De otra parte, tampoco podemos olvidar que el principio de buena fe impone un ejercicio de moderación a la posibilidad de resolución de un contrato. Esa práctica responde a aquellos casos en los que el incumplimiento alegado no es absoluto o no involucra la razón principal por la cual se obligaron las partes. Véanse, Álvarez v.

---

[9]Nótese que estos casos se atendieron bajo la figura del dolo. Existe dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes se induce a otro a celebrar un contrato que no hubiera hecho. Al definir esta figura hemos expresado que el dolo incluye un "complejo de malas artes, *contrario a la honestidad e idóneo para sorprender la buena fe ajena…*". Véase, Colón v. Promo Motors Imports, Inc., 144 D.P.R. 659, 666 (1997).

Rivera, 165 D.P.R. 1, 19-20 (2005), citando a L. Díez-Picazo y A. Gullón, Sistema de Derecho Civil, 4ta ed. rev., Madrid, Ed. Tecnos, 1983, Vol. II, págs. 226-227. Así, en aquellas instancias en las que la prestación resulta defectuosa, y ello no conlleva un incumplimiento absoluto, debe "moderarse el impulso hacia la resolución, pues podría ocurrir una injusticia". J. R. Vélez Torres, Curso de Derecho Civil: derecho de obligaciones, 2da ed., San Juan, Ed. U.I.A.P.R., 1997, págs. 76-77. Por lo que en estos casos procede un remedio balanceado sobre los daños causados sin llegar al extremo de la resolución del contrato. Íd., 31 L.P.R.A. sec. 3018.

En cuanto a los remedios que provee la Ley Núm. 252, supra, el estatuto reconoce que el tribunal al determinar si una cláusula del contrato fue irrazonable podrá rehusar hacer valer el contrato, hacer valer el resto de éste sin la cláusula irrazonable, o limitar su aplicación con el propósito de evitar un resultado injusto. Sec. 10-101 de la Ley Núm. 252, supra. Al aplicar los remedios provistos por la legislación especial, éstos deben ser administrados liberalmente de forma tal que la parte agraviada sea colocada en una posición tan buena como lo estaría si la otra parte hubiera cumplido perfectamente con su obligación. Sec. 10-103 de la Ley Núm. 252, 31 L.P.R.A. sec. 1260b.

Recordamos que el propósito de nuestra legislación es dual: promover la industria de multipropiedad y clubes vacacionales así como proteger a sus consumidores. En

atención a ello, es nuestra función crear un balance entre estos intereses de forma tal que se proteja a los compradores en esa industria a la vez que fomentemos el crecimiento de ésta y su estabilidad.

III

Con el marco doctrinal antes expuesto debemos analizar los hechos ante nuestra consideración.

Los esposos Silva-Alicea adquirieron el 3 de abril de 2005 la segunda semana del mes de junio de 2006, para su uso anual durante un término de sesenta años en el complejo vacacional Boquerón Beach Resort. Las partes acordaron que ese derecho comenzaría a utilizarse a partir del 2006. De igual forma, los esposos Silva-Alicea fueron informados mediante el contrato de compraventa y el ofrecimiento público aprobado por la Compañía de Turismo que la construcción de las instalaciones y alojamientos no estaban terminados y que se esperaba completarlas durante la primera mitad del 2006. Para ello, los esposos Silva-Alicea pagaron la totalidad de $10,225. Posteriormente, los esposos Silva-Alicea hicieron las gestiones para utilizar la semana adquirida.[10] A esta fecha, las instalaciones no estaban terminadas, por lo que no pudieron disfrutar el derecho vacacional adquirido. Como consecuencia, para agosto solicitaron la cancelación del contrato.

_____

[10]Del expediente no surge cuándo se hicieron estas gestiones.

Los hechos demuestran que Aquarius cumplió con los requisitos de la Ley Núm. 252, *supra*, al divulgar la fecha estimada para completar las instalaciones. De igual forma, surge que Aquarius no informó a los compradores que la ley le concedía un término adicional de dieciocho meses para terminar la construcción de éstas. En efecto, Aquarius ejerció el derecho concedido por el estatuto según consta de la certificación emitida por la Compañía de Turismo y culminó la edificación de las instalaciones pocos meses después, en noviembre de 2006.

Los esposos Silva-Alicea no cuestionan el contrato ni los documentos que le fueron entregados, por lo que éstos no están en controversia. Alegan que no hubieren adquirido su derecho de multipropiedad de haber conocido que las instalaciones no iban a estar disponibles para el verano del 2006. Los esposos Silva-Alicea exponen ante este Tribunal que aunque la Ley Núm. 252, *supra*, le concede dieciocho meses al desarrollador para la construcción de las instalaciones del club vacacional desde la fecha estimada, éste debió divulgar dicho término a base del principio de buena fe. Reconocen que la Ley Núm. 252, *supra*, no le impone al desarrollador la obligación de informar sobre el término adicional para completar las instalaciones. Asimismo, cuestionan las expresiones del foro apelativo intermedio a los efectos de que éstos debían informarse adecuadamente.

Los esposos Silva-Alicea pretenden resolver el contrato arguyendo que se violó el principio de buena fe

para sostener que procede su resolución. A los únicos fines de atender tal reclamo, y revisado cuidadosamente el expediente ante nuestra consideración, encontramos que no existe razón alguna que nos permita inferir que Aquarius violó el principio de buena fe. Tampoco podemos colegir que el motivo para adquirir el derecho vacacional de sesenta años fue exclusivamente para disfrutarlo en el verano de 2006 o que la disponibilidad del complejo para esa fecha fuera el factor determinante para contratar ni que al momento de otorgar el contrato Aquarius representara indebidamente o incurriera en una práctica engañosa porque conociera que las instalaciones no estarían completadas para la semana adquirida por los esposos Silva-Alicea o que al momento de estimar la fecha informada pudiera prever que no culminaría la construcción de éstas.

Al examinar las actuaciones que realizó Aquarius surge que cumplió con todos los deberes impuestos por la Ley Núm. 252, *supra*, y ofreció toda la divulgación requerida por el estatuto a los esposos Silva-Alicea. El contrato estableció claramente que las instalaciones no estaban terminadas y que la Ley Núm. 252, *supra*, regía el régimen adquirido. De igual forma, Aquarius hizo formar parte del acuerdo el documento de ofrecimiento público que contó con el aval de la Compañía de Turismo. Del documento de ofrecimiento público entregado a los esposos Silva-Alicea consta la fecha estimada que Aquarius proyectó para finalizar las instalaciones. El desarrollador no informó a

los esposos Silva-Alicea de su derecho a completar las instalaciones en un periodo mayor según dispone el estatuto especial. Claramente expuso –como exige la Ley Núm. 252, *supra*– el derecho de resolución del contrato en el término de siete días a partir de la firma del contrato de compraventa. Como vimos, el legislador no exigió en la Ley Núm. 252, *supra*, que el desarrollador informara sobre su derecho a finalizar las instalaciones en una fecha posterior a la estimada. Sin embargo, al cumplir con las exigencias del estatuto, Aquarius estableció e informó a los esposos Silva-Alicea la fecha estimada para completar las instalaciones para la mitad del 2006. De esta forma cuando los esposos Silva-Alicea firmaron el contrato pudieron considerar la probabilidad de circunstancias fuera del control de Aquarius que le impedirían cumplir con lo proyectado e impedirían el disfrute del derecho adquirido durante la segunda semana del mes de junio de 2006.

Como hemos examinado, la ley reconoce la eventualidad de que un desarrollador no pueda culminar las instalaciones en el tiempo estimado. Por ello, el estatuto le reconoce un término adicional de dieciocho meses para completar los alojamientos. A su vez, contempló que un exceso de ese periodo podría afectar el derecho de los consumidores al disfrute de su propiedad, por lo que les reconoció la potestad de cancelar el contrato si ello ocurriese. Aquarius ejerció su derecho a contar con un tiempo adicional para completar las instalaciones. Éstas

fueron culminadas en noviembre de 2006, es decir, a tan solo seis meses de la fecha proyectada. El que Aquarius se beneficiara de las disposiciones contenidas en la Ley Núm. 252, *supra*, no implica que actuó violentando el principio de buena fe.

En el caso de autos no existe indicio alguno de que Aquarius actuara violando el principio de buena fe. El hecho de que Aquarius no informó a los esposos Silva-Alicea lo que dispone la Ley Núm. 252, *supra*, no constituye un incumplimiento de la ley ni un quebrantamiento del deber de la lealtad y honestidad. Al hacer un balance de los intereses contrapuestos, resalta que el contrato y el ofrecimiento público entregados a los compradores claramente disponían que aplicaba la Ley Núm. 252, *supra*, el que las instalaciones no estaban construidas y la fecha estimada de mediados del 2006 para terminarlas. No existe prueba alguna de que al momento de otorgar el contrato Aquarius supiera o pudiera prever que no podría cumplir con la fecha estimada. La buena fe se presume e impone a todas las partes un deber recíproco. Una parte no puede pretender ampararse en el principio de buena fe para justificar su desconocimiento y de esta forma evitar el cumplimiento con lo pactado. Ello atentaría contra el principio de toda obligación contractual. Pretender o inferir lo contrario, impondría sobre Aquarius un deber no contemplado por nuestro legislador cuyo efecto le impediría el disfrute de un

derecho reconocido por la ley especial para culminar las instalaciones en el periodo contemplado por el estatuto.

El desarrollador de un club vacacional o un derecho de multipropiedad no está obligado por la Ley Núm. 252, *supra*, a informar al comprador del tiempo adicional que le concede la ley especial para completar unas instalaciones que no están terminadas al momento de ofrecer las mismas. Su deber es informar la fecha estimada en la que proyecta que éstas estarán disponibles. Bajo el principio de buena fe habrá situaciones en donde el desarrollador deberá informar sobre cualquier situación que afecte la fecha estimada y comunicada a los futuros compradores al momento de otorgar el contrato. La evaluación de estas circunstancias se hará conforme a la prueba presentada y los hechos particulares de cada caso.

Según el escenario antes expuesto, concluimos que Aquarius actuó conforme a la Ley Núm. 252, *supra*, y no infringió el principio de buena fe que permea en este tipo de contratación.

A pesar de lo anterior, consideramos que Aquarius no tenía la obligación de fijar una fecha cierta de entrega y de comienzo para el disfrute del derecho vacacional adquirido. Nótese que las partes acordaron que ese derecho comenzaría a utilizarse a partir del 2006, por lo que los esposos Silva-Alicea pagaron la cuota de mantenimiento y las partes establecieron el 2006 como la fecha base para el cómputo por sesenta años de su derecho vacacional. La propiedad no estuvo disponible para su uso durante el

2006. Tal incumplimiento no frustra el fin del negocio pactado, por lo que no procede la resolución del contrato sino la compensación del daño que ello causó al matrimonio.

En consecuencia, procede que lo pagado con relación a la propiedad durante el 2006 se aplique a los gastos de mantenimiento que corresponde al matrimonio para años futuros. Igualmente, el periodo de uso de sesenta años no puede ser computado desde el 2006 porque las instalaciones no estuvieron disponibles para su disfrute. Siendo ello así, este periodo comenzó a transcurrir desde que los esposos Silva-Alicea pudieron haber disfrutado de su derecho vacacional, es decir, desde el verano de junio de 2007, ya que las instalaciones estuvieron disponibles en noviembre de 2006. De esta forma cumplimos con el principio reconocido de que no toda omisión conlleva la nulidad de contratación a menos que recaiga sobre elementos esenciales del contrato al igual que la disposición estatutaria contenida en la Ley Núm. 252, *supra*, de colocar a la parte agraviada en una posición tan buena como lo estaría ante un cumplimiento perfecto. Sec. 10-103 de la Ley Núm. 252, *supra*. Así, cumplimos con el propósito dual que persigue la Ley Núm. 252, *supra*, de promover este tipo de industria y proteger a los consumidores.

IV

Por lo anterior, modificamos la sentencia del Tribunal de Apelaciones a los únicos efectos de que Aquarius deberá

acreditar al matrimonio Silva-Alicea lo pagado por concepto de gastos de mantenimiento para el 2006 a un año futuro, además, el derecho adquirido de propiedad por sesenta años se entenderá que comenzó desde junio de 2007 cuando los esposos Silva-Alicea efectivamente pudieron disfrutarlo. Así modificada, se confirma.


                                        LUIS F. ESTRELLA MARTÍNEZ
                                          Juez     Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilfredo Silva Olivencia, Yvette
Alicea Ruiz y la Sociedad Legal de
Gananciales compuesta por ambos
     Peticionarios

       v.

                    CC-2009-660      Certiorari

Boquerón Resort S.E., h/n/c
Aquarius Vacation Club
     Recurrido

Departamento de Asuntos del
Consumidor
     Agencia Recurrida

Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

SENTENCIA

San Juan, Puerto Rico, a 22 de agosto de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se modifica la sentencia del Tribunal de Apelaciones a los únicos efectos de que Aquarius deberá acreditar al matrimonio Silva-Alicea lo pagado por concepto de gastos de mantenimiento para el 2006 a un año futuro, además, el derecho adquirido de propiedad por sesenta años se entenderá que comenzó desde junio de 2007 cuando los esposos Silva-Alicea efectivamente pudieron disfrutarlo. Así modificada, se confirma.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco disiente con opinión escrita a la cual se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Wilfredo Silva Olivencia, Yvette Alicea Ruiz y la Sociedad Legal de Gananciales compuesta por ambos<br><br>    Peticionarios<br><br>      v.<br><br>Boquerón Resort S.E., h/n/c Aquarius Vacation Club<br><br>    Recurrido<br><br>Departamento de Asuntos del Consumidor<br><br>    Agencia Recurrida | CC-2009-660 | *Certiorari* |

Opinión disidente emitida por la Jueza Asociada señora Pabón Charneco, a la cual se une el Juez Asociado señor Rivera García y el Juez Asociado señor Feliberti Cintrón.

En San Juan, Puerto Rico, a 22 de agosto de 2012.

Disiento del resultado anunciado en la Opinión Mayoritaria que hoy emite este Tribunal. Respetuosamente, considero que la Opinión Mayoritaria erra en su aplicación de la Doctrina de la Buena Fe, la cual permea todo nuestro ordenamiento, y con ello avala la conducta antijurídica de una parte en una relación contractual. En el camino se penaliza a la parte débil en un contrato de adhesión y se torna más difícil para nuestro ordenamiento la protección de uno de los objetivos de la Ley de Derecho de Multipropiedad y Clubes Vacacionales de Puerto Rico, *infra*

(en adelante Ley Núm. 252): proteger a los compradores de derechos vacacionales en Puerto Rico.[11]

I

Según se discute en la Opinión Mayoritaria, la Ley Núm. 252, Ley 252-1995, 31 L.P.R.A. secs. 1251 et seq., le reconoce un derecho a los desarrolladores de Complejos de Multipropiedad a que, una vez revelen la fecha en la cual las facilidades de alojamiento de multipropiedad estarán construidas, si por alguna razón no se han culminado, puedan extender el término para finalizarlas hasta dieciocho (18) meses después de la fecha estimada. 31 L.P.R.A. sec. 1254b.

La controversia del caso de autos nos requiere que interpretemos si al momento de otorgar un contrato de compraventa, un desarrollador que no le divulga al comprador la existencia de esa disposición estatutaria viola la Doctrina de la Buena Fe Contractual. Ello particularmente cuando en el contrato de compraventa **las partes pactan una fecha _cierta_ y _exacta_ en la que el comprador comenzará a disfrutar de su derecho de multipropiedad.**

Considero que en el caso de autos ocurrió una violación a la Doctrina de la Buena Fe Contractual. Es un principio axiomático de nuestro sistema de Derecho la existencia de unas normas vinculantes que van más allá de la letra de los estatutos. Es decir, la norma positiva no

_____

[11] Los hechos del caso de autos están correctamente discutidos en la Opinión del Tribunal, por lo cual no considero necesario repetirlos en

solamente se encuentra en el texto de las leyes aprobadas por la Asamblea Legislativa, sino que a base de la interacción de otras normas pueden surgir doctrinas que suplan la totalidad del derecho positivo de nuestro sistema. En varias ocasiones los contornos de estas doctrinas generales del Derecho son codificados por los legisladores, por lo cual su aplicación caso a caso queda en manos de la Rama Judicial. Véase H.L.A. Hart, *The Concept of Law*, Oxford University Press, New York, 2da Ed., 1994, págs. 135-136. Por lo tanto, el que estas doctrinas generales no estén expresamente contempladas en un estatuto no implica necesariamente que estas no estén supeditadas a principios generales de mayor jerarquía los cuales, de todas formas, son también parte intrínseca del Derecho positivo de una sociedad.

En nuestro ordenamiento, no hay duda que una de estas doctrinas generales es la figura de la Buena Fe. Es principio conocido que esta doctrina permea todo nuestro ordenamiento positivo y abarca toda actividad jurídica. *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517, 528 (1982); *Velilla v. Pueblo Supermarkets, Inc.,* 111 D.P.R. 585, 587-588 (1981). En las relaciones contractuales, esta doctrina se encuentra codificada en el Art. 1210 del Código Civil. 31 L.P.R.A. sec. 3375.

Así, hemos establecido que en el ámbito del derecho de contratos la Buena Fe "impone un arquetipo de conducta social que implica la carga de una **lealtad recíproca** de
_____
esta Opinión Disidente.

conducta valorable y **exigible"**. *BPPR v. Sucn. Talavera*, 174 D.P.R. 686, 696 (2008). (Énfasis suplido). Esta lealtad exigible obliga a las partes a comportarse de manera leal, fiel, honrada y les exige un comportamiento **más allá de un mero actuar correctamente.** *Íd.* pág. 696. Por ende, la Buena Fe debe manifestarse en todas las etapas de la relación contractual, **incluso en la fase de negociación.** *BPPR v. Sucn. Talavera*, supra, pág. 696; *Colón v. Glamourous Nails,* 167 D.P.R. 33, 44 (2006), citando a L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 191. La ausencia de Buena Fe en estas fases puede tener el efecto de viciar el consentimiento de la parte que reclama la violación, lo cual puede dar paso a la resolución del contrato. Véase J. R. Vélez Torres, *Curso de Derecho Civil: Derecho de Contratos*, San Juan, Ed. U.I.A.P.R., T.IV, Vol. II, pág. 48; *Cooperativa La Sagrada Familia v. Castillo*, 107 D.P.R. 405, 414-415 (1978).

La importancia de esta doctrina en la actividad económica contemporánea ha sido reseñada por diversos autores, quienes han expresado que

> el derecho moderno ha adelantado mucho en la protección de este principio, y con ello se está significando cómo su observancia es un elemento vital para toda la circulación económica actual, teniendo en cuenta la manera cómo se realizan los cambios y transacciones, **lo cual...no permite a las partes conocer exactamente la situación jurídica: deben confiar en que sea tal como se les presenta.** J.C. Rezzónico, *Principios fundamentales de los contratos*, Buenos Aires, Ed. Astrea, 1999, págs. 471-472 (Énfasis suplido).

El elemento esencial para analizar si ha ocurrido una violación a la Buena Fe en el ámbito contractual es la **lealtad** que se deban las partes. Según ha expuesto detalladamente el profesor Michel J. Godreau Robles en su seminal artículo *Lealtad y Buena Fe Contractual*, 58 Rev. Jur. U.P.R. 367(1989), esta lealtad adviene a la vida cuando una parte obtiene el conocimiento de las **expectativas que la otra parte tiene sobre el objeto del contrato**. Una vez se conocen estas expectativas, surge el deber de lealtad en la relación, lo cual "puede implicar un comportamiento que vaya mas allá del mero actuar correcta o incluso honestamente". M. J. Godreau, *Lealtad y Buena Fe Contractual*, 58 Rev. Jur. U.P.R. 367, 380 (1989).[12]

Con particular detalle el profesor Godreau expone que

[e]l vínculo contractual, producto como es de actos voluntarios en virtud de los cuales se persuade a la otra parte a través **de promesas que generan en ella expectativas –aún en el caso extremo del contrato de adhesión**– presupone un grado de confianza mutua, ausente en otro tipo de relación patrimonial. El fenómeno contractual es pues uno de los mejores ejemplos de una relación jurídica que presupone el deber de lealtad. Recalquemos que es el *conocimiento* de las expectativas legítimas que la otra parte puede tener, lo que justificará la imposición de deber de *lealtad*. M J. Godreau, *supra*, pág. 380. (Énfasis suplido).

Obviamente, "cada relación se debe evaluar individualmente a la luz de las circunstancias particulares de cada caso, como por ejemplo, la naturaleza de la relación y las cualidades de las partes

---

[12] Citamos con aprobación este análisis en *BPPR v. Sucn. Talavera*, 174

contratantes". *BPPR v. Sucn. Talavera*, supra, pág. 698. En un contrato de adhesión como el del caso de epígrafe, la aplicación de la figura de la buena fe contractual es de mayor relevancia dada la naturaleza de las negociaciones y las relaciones entre las partes. Véase M. J. Godreau, *supra*, págs. 417- 422.

II

Considero que en el caso de autos ocurrió una violación a la Doctrina de la Buena Fe Contractual por parte del Aquarius Vacation Club (en adelante Aquarius). De entrada, es menester enfatizar que, conforme a lo discutido, aunque la Buena Fe permea todo nuestro ordenamiento, la Ley Núm. 252, *supra*, va más allá y **adopta la doctrina de la Buena Fe en su Sección 10-102.** En específico, esa disposición estatutaria establece que:

> Todo contrato o deber regido por este capítulo impone una obligación **de buena fe que significará la honestidad de hecho y la observancia de las normas razonables de trato justo en su cumplimiento o aplicación.** 31 L.P.R.A. sec. 1260a.

Por otro lado, la sección estatutaria que regula el contenido de los documentos de ofrecimiento público de clubes vacacionales establece unos **requisitos mínimos,**[13] lo cual no se traduce necesariamente a que los vendedores de este tipo de propiedad están exentos de dar cumplimiento a otros requisitos que nuestro ordenamiento impone. Esto nos obliga a concluir que la Asamblea Legislativa fue consciente de que podrían existir otros requisitos de

_____
D.P.R. 686, 698 (2008).

divulgación que los desarrolladores de clubes vacacionales tendrían que cumplir al momento de otorgar contratos de compraventa, todo ello sujeto a las normas de la Doctrina de la Buena Fe Contractual.

Entiendo que en el caso de epígrafe Aquarius faltó a la Buena Fe por varias razones. Primero, estamos ante un contrato de adhesión en el cual los compradores no tuvieron ningún tipo de participación en la redacción de los términos de la relación contractual. Se trata de un convenio en el cual las partes entraron a una relación jurídica por **sesenta (60) años**, lo cual incluye el pago de cuotas de mantenimiento a través de la vida de ese término. Incluso, al momento de pactar, los compradores tuvieron que hacer un pago de diez mil doscientos veinticinco dólares ($10,225) **lo cual incluía la cuota de mantenimiento del año 2006.** Todo ello bajo la expectativa de que podrían disfrutar a partir de una fecha cierta -la segunda semana en junio de 2006- del derecho vacacional que estaban comprando.

Esa expectativa era conocida por Aquarius ya que en el propio contrato se estableció que para la segunda semana de junio de 2006, los compradores podían hacer uso de las facilidades que fueron objeto del contrato. **Lo que es más, esa expectativa fue creada por el propio Aquarius, quien tuvo la facultad de redactar los términos del contrato de adhesión otorgado** y a pesar de que la Ley Núm. 252, *supra*, no le requería a este establecer en el

---

[13] *Íd.* sec. 1255a.

contrato de compraventa una fecha cierta en la cual los compradores podrían comenzar a disfrutar de su derecho propietario.

Al crear *motu proprio* esa expectativa surgió un deber de **lealtad** por parte de Aquarius, por lo cual la Doctrina de la Buena Fe contractual que estatutariamente le impuso el ordenamiento a este le exigía que divulgara al matrimonio Silva-Alicea todas las situaciones que pudieran ser esenciales para el perfeccionamiento del contrato. Según discutido, una vez se genera ese deber de lealtad las partes están obligadas a actuar de una manera que **va más allá del mero actuar correctamente**. Por ende, en el caso de autos, Aquarius debía revelar la posibilidad de que el complejo vacacional no estaría disponible para la fecha que se pactó en el contrato ya que el desarrollador se podría acoger a la prórroga de dieciocho meses que la Ley 252, *supra*, le provee.

Lo esencial en ese análisis no es determinar si los compradores hubieran firmado el contrato de compraventa si hubiesen conocido sobre la existencia de ese término. La clave está en determinar si surgió un deber de lealtad en Aquarius. Para ello, es incuestionable el hecho de que en el contrato otorgado entre las partes se pactó una fecha cierta. Ese hecho es uno objetivo, que no requiere desfile de prueba más allá del contrato entre las partes y no requiere conocer el estado subjetivo de las partes contratantes ni los motivos que los llevaron a acordar lo pactado.

En mi opinión, ese detalle era un **factor esencial** del contrato, sobretodo ante el hecho de que **Aquarius conocía de las expectativas de los compradores** de utilizar el complejo vacacional para junio de 2006, lo cual los llevó a obligarse por sesenta (60) años, le pagaron diez mil doscientos veinticinco dólares ($10,225) por ese derecho, incluyendo el mantenimiento por el primer año y que no pudieron disfrutar para la fecha que se pactó en el contrato. Ante ese cuadro fáctico, Aquarius tenía un deber de lealtad hacia los compradores, por lo cual se violó la Buena Fe contractual al no revelar la posibilidad de que la construcción del complejo vacacional no estaría culminada para la fecha que se pactó. Por ende, el consentimiento de los compradores estuvo viciado.

Ciertamente, la Doctrina de la Buena Fe no puede convertirse en una válvula de escape para anular cualquier relación contractual, lo cual llevaría a socavar los cimientos de la Doctrina de *pacta sunt servanda*. No obstante, **los hechos particulares de este caso en el cual estamos ante un contrato de adhesión por un término de sesenta (60) años ameritan la aplicación de la figura.**

III

Finalmente, debo referirme al remedio que otorga la Opinión Mayoritaria a los compradores del caso de epígrafe. El Tribunal entiende que toda vez que los compradores no pudieron disfrutar de su derecho vacacional durante el año 2006, procede que la partida pagada por estos como cuota de mantenimiento sea acreditada a años

futuros. Op. del Tribunal pág. 27. Además, establece que a consecuencia de que los compradores no pudieron disfrutar de su derecho vacacional durante el año 2006, el periodo de sesenta (60) años que acordaron las partes "comenzó a transcurrir desde que los esposos Silva-Olivencia pudieron haber disfrutado de su derecho vacacional, es decir, desde el verano de junio de 2007…". *Íd.* págs. 27-28.

De entrada, es sorprendente que luego de un entramado judicial que duró seis (6) años, el matrimonio Silva-Olivencia solo recibe como compensación por el incumplimiento contractual del cual fueron víctimas la ínfima cantidad de ciento setenta y siete dólares ($177). Ni siquiera se les reconoce una partida por daños. Es curioso que ese sea el resultado del "balance de intereses" que realiza la Opinión Mayoritaria: los consumidores que pactaron un contrato de adhesión y que litigaron su caso por seis (6) años reciben ciento setenta y siete dólares ($177) y la parte poderosa de la relación, **que incumplió con su obligación en el primer año de la relación contractual a pesar de conocer las expectativas de la otra parte** ve inalterada la acreencia a la cual tiene derecho por sesenta (60) años.

Por último, resulta interesante que la Opinión Mayoritaria que hoy se emite concluya que exigir que Aquarius divulgara la existencia de la disposición estatutaria que le permite ampliar el término de construcción de las facilidades vacacionales por dieciocho (18) meses sería un ejercicio de legislación judicial ya

que "impondría sobre Aquarius un deber no contemplado por nuestro legislador cuyo efecto le impediría el disfrute de un derecho reconocido por la ley especial para culminar las facilidades en el periodo contemplado por el estatuto". *Íd.* pág. 26. No obstante, la Opinión no considera como un ejercicio de legislación judicial el que en la Sentencia que hoy se emite se **modifican abiertamente los términos del contrato firmado entre Aquarius y la parte peticionaria de epígrafe**. Previo a hoy, el contrato entre las partes tendría vida desde el año 2006 hasta el 2066. Ahora, el contrato en realidad tendrá una vigencia desde el 2006 hasta el 2067. ¿Cuál es la medida más creativa, aplicar una doctrina general del Derecho para resolver un contrato o modificar judicialmente los términos de este en una sentencia?

IV

Por todo lo anterior, disiento del resultado que hoy se anuncia. Me preocupa seriamente la posición en que queda la parte peticionaria de epígrafe, víctima de un vicio del consentimiento y que está obligada a continuar en una relación contractual que se incumplió desde el primer año de vigencia. Me preocupa además lo que pudiera significar la Opinión que hoy se emite para los consumidores puertorriqueños de este tipo de servicio y por los cuales primordialmente se aprobó la Ley Núm. 252, *supra*.

Consecuentemente, revocaría la determinación del Tribunal de Apelaciones y resolvería el contrato otorgado

entre las partes por vicios del consentimiento a la luz de la Doctrina de la Buena Fe Contractual.

Mildred G. Pabón Charneco
Jueza Asociada